# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE ASSAD,                             ) | |
|                                        ) | |
|          Plaintiff,              ) | |
|                                          ) | Case No. _____ |
|       v.                                 ) | |
|                                          ) | JURY TRIAL DEMANDED |
| RAND CAPITAL CORPORATION,    ) | |
| ERLAND E. KAILBOURNE, ROBERT M.    ) | |
| ZAK, ALLEN F. GRUM, ROSS B. KENZIE,   ) | |
| and JAYNE K. RAND,                     ) | |
|                                          ) | |
|         Defendants.          ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on January 25, 2019 (the "Proposed Transaction"), pursuant to which shares of Rand Capital Corporation's ("Rand Capital" or the "Company") common stock will be acquired by East Asset Management, LLC ("East Asset").

2.      On January 24, 2019, the Board caused Rand Capital to enter into a stock purchase agreement (the "Stock Purchase Agreement") with East Asset.  Pursuant to the terms of the Stock Purchase Agreement, East Asset will purchase approximately 8.3 million shares of Rand Capital's common stock for $25 million in cash and assets, or $3.00 per share.

3.      On April 18, 2019, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement, which scheduled a stockholder vote on the Proposed Transaction for May 16, 2019, omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Rand Capital common stock.

9.      Defendant Rand Capital is a New York corporation and maintains its principal executive offices at 2200 Rand Building, Buffalo, NY 14203.  Rand Capital's common stock is

traded on the NASDAQ Capital Market under the ticker symbol "RAND."

10.     Defendant Erland E. Kailbourne is a Chairman of the Board of Rand Capital.

11.     Defendant Robert M. Zak is Vice Chairman of the Board of Rand Capital.

12.     Defendant Allen F. Grum ("Grum") is President, Chief Executive Officer, and a director of Rand Capital.

13.     Defendant Ross B. Kenzie is a director of Rand Capital.

14.     Defendant Jayne K. Rand is a director of Rand Capital.

15.     The defendants identified in paragraphs 10 through 14 are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

16.     Rand Capital is a Business Development Company ("BDC") with a wholly-owned subsidiary licensed by the U.S. Small Business Administration ("SBA") as a Small Business Investment Company ("SBIC").

17.     Rand Capital focuses its equity investments in early or expansion stage companies and generally lends to more mature companies.

18.     On January 24, 2019, the Board caused Rand Capital to enter into the Stock Purchase Agreement with East Asset.

19.     Pursuant to the terms of the Stock Purchase Agreement, East Asset will purchase approximately 8.3 million shares of Rand Capital's common stock for (i) cash consideration in an amount equal to $25 million, minus (ii) the fair value of the loans and other securities (the "Contributed Investment Assets") being contributed by East Asset to the Company, plus (iii) the aggregate amount of accrued but unpaid interest, penalties, fees, charges, and other amounts on

the Contributed Investment Assets (the "Contributed Investment Assets Fair Value").

20.     According to the press release announcing the Proposed Transaction:

Rand Capital Corporation (Nasdaq: RAND) ("Rand" or "Rand Capital" or the "Company"), announced today that the Board of Directors has entered into a stock purchase agreement to sell approximately 8.3 million shares of Rand Capital's common stock to East Asset Management, LLC ("EAM") for $25 million in cash and assets. The purchase price of $3.00 per share represents a 33% premium over the January 24, 2019 closing price of $2.26 per share. The sale and issuance of common stock pursuant to the stock purchase agreement is subject to shareholder approval and receipt of required regulatory approval from the U.S. Small Business Administration ("SBA"). . . .

The Proposed Transactions

EAM plans to purchase approximately 8.3 million in Rand shares for $25 million consisting of approximately $13.5 million in cash and the contribution of approximately $11.5 million in portfolio assets. The contributed portfolio assets are income-producing instruments that were originated in the last 48 months and will immediately increase net investment income for Rand. EAM will hold approximately 57% of shares outstanding following the share purchase.

A new entity, Rand Capital Management, LLC ("RCM"), will be established as an external management company and will be retained by Rand Capital to be its investment advisor. RCM's operations will remain in Buffalo, New York, with Allen F. "Pete" Grum as President and Chief Executive Officer, and Daniel P. Penberthy as Executive Vice President and Chief Financial Officer, for RCM. They will continue as well as members of RCM's investment committee. The retention of RCM to externalize the management structure is also subject to shareholder approval.

The proposed transactions, which are subject to certain shareholder and regulatory approvals and consents, is expected to close during the third quarter of 2019. Following the close, Rand will continue to trade on the Nasdaq under its ticker "RAND" and will operate as an externally-managed business development corporation ("BDC"). . . .

In connection with closing and contingent upon meeting certain tax-related conditions, Rand intends to elect to become a regulated investment company ("RIC") for U.S. federal tax purposes enabling the pass through of capital gains and investment income to shareholders without payment of corporate-level U.S. federal income tax by Rand.

To qualify as a RIC, Rand's Board of Directors intends to declare a special dividend of an estimated $22 million, or $1.50 per share, representing its current estimate of

accumulated earnings and profits since inception. The dividend amount is subject to final determination of the estimate after closing. The dividend is expected to be comprised of 20% cash and 80% stock. Each shareholder will have the opportunity to elect to receive the dividend in cash or additional shares of Rand stock. The exact distribution of cash and stock to any given shareholder will be subject to limitation on the aggregate amount of cash and stock available for distribution, as well as the individual and collective elections by shareholders. The entire distribution will be taxable to shareholders regardless of whether it is received in cash, stock, or any combination thereof.

In addition to the externalization of management, the intent of the restructuring and addition of yielding assets is to enable Rand to become a regular dividend-paying BDC. Rand's Board of Directors intends to pay greater than 90% of its investment company taxable income in regular cash dividends to shareholders.

21.     Section 7.7(a) of the Stock Purchase Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals.

22.     Further, pursuant to Section 7.7(b) of the Stock Purchase Agreement, the Company must promptly advise East Asset of any proposals or inquiries received from other parties.

23.     Moreover, Sections 7.7(e) and (f) of the Stock Purchase Agreement contain a "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants East Asset a "matching right" with respect to any "Superior Proposal" made to the Company.

24.     Further locking up control of the Company in favor of East Asset, the Stock Purchase Agreement provides for a "termination fee" payable by the Company to East Asset if the Individual Defendants cause the Company to terminate the Stock Purchase Agreement.

***Shareholder Opposition to the Proposed Transaction***

25.     On March 27, 2019, User-Friendly Phone Book, LLC ("User-Friendly"), the largest individual stockholder of Rand Capital, sent a letter to Individual Defendant Grum stating its opposition to the Proposed Transaction.  The letter provided:

March 27, 2019

Mr. Allen F. Grum
President and Chief Executive Officer
Rand Capital Corporation
2200 Rand Building
Buffalo, New York 14203

cc: The Board of Directors

> Re:   Rand Capital Corporation's proposed transaction with East Asset
>        Management LLC

Dear Mr. Grum:

As Rand Capital Corporation's ("Rand" or the "Company") largest shareholder, we were extremely disappointed by Rand's announcement on January 25, 2019, that it entered into a stock purchase agreement (the "Stock Purchase Agreement"), with East Asset Management, LLC ("East") pursuant to which the Company will become controlled by East and managed by an East affiliate (the "Adviser"). Unfortunately, upon analyzing the details of the proposed transaction as set forth in the preliminary proxy statement filed by the Company on March 11, 2019 (the "Proxy Statement"), our concerns regarding the inadequacy of the terms of the proposed transaction have been confirmed and we now feel compelled to express our views directly to the Company's Board of Directors (the "Board") and publicly to our fellow shareholders.

Under the Stock Purchase Agreement, Rand has agreed to sell control of the Company for $3.00 per share, or aggregate deal consideration of $25.0 million in a mix of cash and private investments, amounts that we believe are wholly inadequate and terms that we believe are extremely bad and unfair for shareholders. For the reasons we summarize in this letter, we intend to vote AGAINST the proposed transaction.

We plan on voting AGAINST the proposed transaction for the following reasons, which are explained more fully below:

> • the $3.00 per share acquisition price is inadequate and represents an approximate 40% discount to the Company's NAV per share of $4.99 as of December 31, 2018;

> • in a transaction in which the Company is selling a 57% controlling interest, the Company should receive a premium for its shares, not an approximate 40% discount to NAV per share;

• current Rand shareholders will suffer substantial dilution as a result of the sale of shares of the Company's common stock at a price that is below the Company's current NAV and as a result of a planned Special Dividend of which East will be entitled to receive 57%;

• the financial analyses performed by the Company's financial advisor were premised on outdated financial information which lead to an undervaluing of the Company's NAV per share and skews the Adviser's conclusion on which the Board relied;

• the Adviser's fee structure under the proposed Investment Management Agreement, including the incentive fee of 20% of the Company's net capital gains and 20% of the Company's cumulative net return in excess of 8.75%, creates serious conflicts and misaligns the interest of the Adviser and the Company's shareholders, and the incentive fees are substantially dilutive to current shareholders' up-side participation in any of the Company's investment returns;

• there is no credible support for the value of the assets to be contributed by East, which comprise 52.4% of the aggregate consideration to be received by the Company in the proposed transaction, has been accurately measured;

• East is incentivized to over-value the assets to be contributed, and the Company has failed to provide adequate information regarding the nature of these contributed assets or the process by which the Company and East have agreed on their value;

• there is no assurance that the Company will declare the Special Dividend or any other dividends in the future; and

• the $750,000 termination fee payable by the Company if the proposed transaction were not to be consummated, and the $500,000 fee payable to the Company's financial advisor are excessive and potentially debilitating to the Company and its shareholders.

The $3.00 per share acquisition price is inadequate and represents an approximate 40% discount to the Company's NAV per share as of December 31, 2018

The Company promotes the $3.00 per share purchase price as a 33% premium over the $2.26 closing price of the Company's common stock on January 24, 2019, the day before the transaction was announced. In light of the Company's very thin daily trading volume, though, we do not believe that this metric can fairly be used to approximate a premium or even fair value. For reference, the Company had an average daily trading volume of only 13,642 shares over the past year, and only 15,500 shares of common stock traded between January 1, 2019 through January 24, 2019, or .245% of the Company's outstanding shares of common stock. On

January 24, 2019, the day prior to the public announcement of the proposed transaction, only 100 shares of the Company's common stock traded.

Moreover, the Company's net asset value (NAV) per share was $4.99 as of December 31, 2018. When considered relative to the NAV and not the trading price, the $3.00 per share amount actually represents a 40% discount to the price to be paid by East.

Current Rand shareholders will suffer substantial dilution as a result of the sale of shares of the Company's common stock at a price that is below the Company's current NAV

If the proposed transaction is approved, East will own approximately 57% of the Company's outstanding shares of common stock before the effect of the Special Dividend. Given that the 8,333,333.33 shares of common stock to be issued to East will be issued at a price per share below the Company's per share NAV, current shareholders will suffer substantial dilution immediately upon consummation of the proposed transaction, and will suffer greater dilution if the Special Dividend is declared and paid.

Unlike typical change of control transactions in which existing shareholders are cashed out of the target business, the Rand shareholders will continue to own all of their shares and may receive a special dividend from the Company, of which at least 80% would consist of more shares in the Company. But, because the Company has structured the payment of the Special Dividend to occur after the consummation of the proposed transaction, East, as a 57% shareholder, will receive 57% of the Special Dividend as well as its proportional share of any future dividends. Therefore, assuming that East elects to receive payment of its special dividend in shares of the Company's common stock, East's 57% ownership position will increase with the Special Dividend.

Moreover, the Company fails to explain the potential future dilution that could be suffered if shares are issued by the Company out of the newly authorized 90 million additional shares.

If the main objective of the Board is to externalize the management of the Company, this objective can be achieved by simply terminating the current management and entering into contractual arrangements with the Adviser. The addition of a substantially dilutive 57% equity stake is unnecessary given the totality of the proposed transaction. Alternatively, if the main objective of the Board is to inject capital into the Company, consider that we acquired our shares less than one year ago – for cash – at the same price per share to be paid by East, yet acquired not even 25% of the Company, and the Company remained fully intact with no changes to its governance or investment philosophy. By contrast, East will own more than 57% of the Company – with only a $6.5 million cash infusion into the

Company -- as a result of the transaction and the Special Dividend and plans to alter dramatically the way the Company conducts its business.

We do not believe that $25 million in aggregate consideration adequately compensates shareholders for this significant dilution.

The financial analyses performed by the Company's financial advisor were premised on outdated financial information which led to an undervaluing of the Company's NAV per share

We believe that the fairness opinion delivered by Keefe, Bruyette & Woods, Inc. ("KBW") was based on outdated financial statements, which led KBW to undervalue the Company's common stock and conclude that the $3.00 per share purchase price was "fair" to the Company. As stated in the Proxy Statement, KBW's analysis used NAV per share data as of September 30, 2018. As of that time, the Company's NAV per share was $4.84. However, as of December 31, 2018 the Company's NAV per share increased to $4.99 per share, representing a 3.3% increase in NAV per share. This increase in NAV per share was not incorporated into KBW's calculations or analyses, therefore undervaluing the implied value per share of the Company's common stock.

Using the Company's December 31, 2018 NAV, the range of the implied value per share of the Company's common stock would have increased by $0.07 to $0.11 cents per share, to $2.25 to $3.59 per share. We believe that had the updated NAV per share been incorporated into the KBW report, KBW may have come to a different conclusion as to the fairness of the proposed per share acquisition price.

Further, we question KBW's decision to apply only the "Minimum" and "Median" price-to-NAV per share multiples of the comparable companies it included in the Company's peer group. There is no explanation in the Proxy Statement as to why KBW chose not to apply the "75th Percentile" and "Maximum" price-to-NAV per share multiples of the peer group. If it had done so, using even the outdated September 30, 2018 NAV per share figure, its analysis would have provided a range of the implied value per share of the Company's common stock of $4.37 to $4.84. If, as we suggest, KBW used the updated NAV per share of $4.99 as of December 31, 2018, the range of implied value per share of the Company's common stock would have been $4.49 to $4.99. As illustrated by these updated calculations, we believe aggregate deal value is not reflective of Rand's intrinsic value and will short-change existing shareholders.

The Adviser's fee structure under the proposed Investment Management Agreement creates serious conflicts and misaligns the interests of the Adviser and the Company's shareholders

We believe that the proposed Investment Management Agreement to be entered into by the Company with the Adviser as part of the transaction presents real

9

conflicts of interest that misalign the Adviser's and the Company's interests given the totality of the proposed transaction.

Under the Investment Management Agreement, the Company would pay the Adviser, as compensation for investment advisory and management services, fees consisting of two components: (i) a "Base Management Fee" and (ii) an "Incentive Fee". The Base Management Fee would be 1.50% per annum of the Company's total assets (other than cash or cash equivalents, but including assets purchased with borrowed funds). The Incentive Fee would consist of two parts: (1) a portion based on the Company's pre-incentive fee net investment income (the "Income Based Fee") including 20% of the Company's cumulative net return in excess of 8.75%, and (2) 20% of the net realized capital gains received on the Company's portfolio of securities on a cumulative basis for each calendar year, net of all realized capital losses and all unrealized capital depreciation for that same calendar year (the "Capital Gains Fee").

While the Company attempts to present the fees to be paid to the Adviser in the best light possible, we believe that the table displaying pro forma information on page 82 of the Proxy Statement is misleading and not useful for shareholders to evaluate the Company's assertion that an externally managed business development corporation is more cost efficient than an internally managed one. The table on page 82 displays the fees as they would have been payable for the year ended December 31, 2018. However, no Incentive Fee would have been paid for the year ended December 31, 2018. Further, the table does not include the approximately $196,500 of fees that would be due to the Adviser based on the $13.1 million worth of assets to be contributed by East to the Company as part of the proposed transaction.

We believe, in light of the totality of the proposed transaction, that this fee structure misaligns interests and incentives the Adviser to increase the asset base while also taking on additional investment risk in order to increase its fees. Moreover, East as a part owner of the Adviser, may be motivated to maximize the Adviser fee income at the expense of dividends to shareholders.

In addition, the Income Based Fee and the Capital Gains Fee payable to East will substantially dilute current shareholders' ability to participate in any upside return the Company may earn, as East would be entitled to 20% of any pre-incentive fee net investment income and 20% of any net realized capital gains.

There is no assurance that the value of the assets to be contributed by East, which comprise 52.4% of the aggregate consideration to be received by the Company in the proposed transaction, has been accurately measured

As described in the Proxy Statement, the aggregate consideration to be received by the Company from East is to consist of approximately $11.9 million in cash and approximately $13.1 million in "income producing portfolio assets" (the

"Contributed Assets"). The Contributed Assets comprise 52.4% of the aggregate value to be received by the Company. However, there is no explanation in the Proxy Statement as to how these Contributed Assets were valued by the Company prior to entering into the Stock Purchase Agreement. As the Company admits on page 24 of the Proxy Statement:

the Company and East will agree upon a Contributed Investment Asset Fair Value for each of the Contributed Investment Asset to be contributed by East to the Company as consideration in the Stock Purchase Transaction. Given the Contributed Investment Assets consist of loans and other securities of privately held companies, determining the fair value of these Contributed Investment Assets is subjective and inherently uncertain. As a result, the parties could agree to attribute a Contributed Investment Asset Fair Value to any such Contributed Investment Asset that is later determined to be in excess of its actual fair market value. Furthermore, the Company's due diligence investigation of the Contributed Investment Assets may not reveal risks inherent in any Contributed Investment Asset or the underlying portfolio companies. As a result, the business, results of operations or financial condition of any such portfolio company may decline after the Closing, resulting in Contributed Investment Assets having a fair value that is less than the Contributed Investment Assets Fair Value attributed to such assets at Closing.

The Proxy Statement is silent on the process by which the "Contributed Investment Assets Fair Value" was calculated. There is also no information in the Proxy Statement to suggest that the Company attempted to maximize the value of the assets to be received, or the nature of any negotiations at all. Rather, the Proxy Statement includes conclusory statements such as, "[a]s of December 31, 2018, the total Contributed Investment Assets Fair Value for the Contributed Investment Assets was determined by the parties to be $13.1 million" and "[t]o the extent that the Company does not agree with the calculation of the Contributed Investment Assets Fair Value presented by East, the parties shall promptly negotiate in good faith so as to agree upon the calculation of the Contributed Investment Assets Fair Value." Shareholders are asked to simply trust the undisclosed methodology (if any) employed by the Company's management, who were negotiating their post-transaction employment terms with East concurrently with the Company negotiating the proposed transaction with East (employment terms that have not been disclosed in the Proxy Statement). Considering the incentive for East to over-value the assets that it is contributing, we find the omission of an explanation of the valuation process quite troubling.

What is as worrying to us is that the substantial majority of the Contributed Assets are debt instruments (e.g. promissory notes, term loans, term notes, etc.) with interest rates ranging from 12% to 12.5%, which we believe are indicative of high risk loans. Despite the riskiness of these Contributed Assets, the Company agreed to assign a fair value to each of the debt instruments equal to the face value of the debt instruments themselves. Therefore, management was unable, or unwilling, to

have the fair value of these assets discounted to account for the repayment risk inherent in these types of instruments. We fear, but have no way to determine from any disclosure in the Proxy Statement, that the $13.1 million aggregate fair value is overstated and is at real risk of being devalued.

There is no assurance that the Company will declare the Special Dividend or any other dividends in the future

The Proxy Statement makes it clear that the Company views the payment of a Special Dividend and a continuing dividend in connection with the RIC Election to be a very compelling reason for shareholders to vote in favor of the proposed transaction. As explained in the Proxy Statement, as a regulated investment company, the Company intends to declare and pay a Special Dividend to shareholders in an amount equal to the Company's "accumulated earnings and profits" since the Company's inception and expects to pay 90% of the Company's annual investment company taxable income to shareholders through a quarterly dividend going forward.

We think it is clear that the significant uncertainty surrounding the RIC Election and the payment of the Special Dividend or a reoccurring dividend severely diminishes the value of the proposed transaction to shareholders. The Proxy Statement is full of cautionary language illustrating the uncertainty of the promise of a Special Dividend or a reoccurring dividend. In eight separate locations throughout the Proxy Statement, the Company includes language substantially as follows:

[h]owever, despite it being our intention to declare and pay the Special Dividend to shareholders after the completion of the transactions, we cannot assure you that the Special Dividend, or any other dividend or distribution, will be paid to shareholders after the completion of the transactions or at all or that the Company will ever adopt a new dividend policy that includes regular cash dividends to shareholders.

Problematically, the Proxy Statement is void of any explanation of the reasons behind this uncertainty. Shareholders are therefore left with contradictory statements as to the likelihood of the Special Dividend or a reoccurring dividend. Without this information, we can only conclude that these dividends are highly suspect and their value should be greatly discounted, if not ignored.

The termination fee payable by the Company if the proposed transaction were not to be consummated, and the fee payable to the financial advisor are excessive

Under the terms of the Stock Purchase Agreement, the Company will be required to pay East a termination fee if the Stock Purchase Agreement is terminated for certain enumerated reasons, covering all of East's out-of-pocket costs and expenses incurred to date, not to exceed $750,000. Considering the financial condition of the Company, if the Company were obligated to pay the full $750,000 termination fee,

or even a substantial portion of the full amount, the Company would not be able to pursue any alternative transaction or, in the absence of an alternative transaction, operate in the ordinary course. The Proxy Statement confirms our concerns as it states on page 28:

[t]he Stock Purchase Agreement provides for the payment by the Company of a Termination Fee (as defined herein) of up to $750,000 if the Stock Purchase Agreement is terminated under certain circumstances. Given the Company's financial condition and amount of cash and cash equivalents on hand, payment of the Termination Fee in an amount up to $750,000 would likely have a material adverse effect on the Company's financial condition and on its ability to make any significant new investments or follow-on investments in the near future.

In our opinion, a termination fee is intended to act as an incentive for the parties to an agreement to complete the transaction in a timely manner. Instead, the Company has agreed to a termination fee that might have the effect of an ultimatum to shareholders: approve the transaction or allow for the Company's assets to be depleted. We do not believe this choice is fair for shareholders.

The Company's negotiation of the termination fee is brought into starker view when considered in the context of our conversations with the Company prior to it entering into the Stock Purchase Agreement. We alerted the Company to the fact that we would be voting against the proposed transaction. As we are the Company's largest shareholder at 23%, the Company knew that obtaining the requisite shareholder approval of the proposed transaction was going to be difficult. Despite knowing that there was an increased chance that the proposed transaction would be voted down by shareholders and the termination fee required to be paid, the Company nonetheless agreed to a termination fee that we believe is excessive. The sooner shareholders can reject the proposed transaction, the less costs the Company would be obligated to reimburse to East.

Further, the Company has agreed to pay to KBW a $500,000 fee for advisory services rendered, with $200,000 having been paid upon KBW's delivery of its fairness opinion to the Company, and the remaining $300,000 payable upon the closing date of the proposed transaction. For a company that is in such a precarious financial position as the Company, we believe that the payment of the $500,000 advisory fee, $200,000 of which has been paid and would be in addition to any amount of the $750,000 termination fee payable to East if the proposed transaction is terminated, would be a gross mismanagement of the Company's limited assets and, if paid, will debilitate the Company's ability to operate successfully into the future.

****

As outlined above, our opinion is clear that the proposed transaction does not compensate the shareholders adequately, is not in the best interests of shareholders

and should not be approved by Rand's owners. We are disappointed that Rand's management and Board have chosen to move forward with such an inadequate transaction. It appears to us that the Board abrogated its duty to Rand's shareholders by agreeing to a deal that is favorable to East at the expense of the current shareholders. While certain of the elements of the proposed transaction could make sense in other circumstances, the compilation of these elements in the current transaction are troubling and costly to the shareholders.

It is for the reasons enumerated above that we plan on voting "AGAINST" to all proposals to be voted upon at the Company's Special Meeting.

If the Company discloses additional information regarding the transaction, we intend to review it carefully and potentially share our views of the transaction further.

Kind regards,

/s/ Bruce C. Howard

Bruce Howard
Chief Executive Officer
User-Friendly Phone Book, LLC

26.     On April 10, 2019, User-Friendly announced that it continued to oppose the

Proposed Transaction.  According to User-Friendly's April 10, 2019 press release:

User-Friendly Phone Book, LLC ("User-Friendly"), the largest stockholder of Rand Capital Corporation (the "Company" or "Rand") (NASDAQ:RAND), announced today that it continues to oppose the proposed transaction between Rand and East Asset Management, LLC ("East") that was announced on January 25, 2019. In a letter to the Company's Board of Directors on March 27, 2019, User-Friendly detailed the reasons for its opposition, which are highlighted below. To date, User-Friendly has not received a response to its letter from the Board of Directors.

User-Friendly intends to vote AGAINST the proposed transaction for the following reasons:

• the $3.00 per share acquisition price is inadequate and represents an approximate 40% discount to the Company's NAV per share of $4.99 as of December 31, 2018;

• in a transaction in which the Company is selling a 57% controlling interest, the Company should receive a premium for its shares, not an approximate 40% discount to NAV per share;

• current Rand shareholders will suffer substantial dilution as a result of the sale of shares at a price that is below the Company's current NAV and as a result of a planned Special Dividend of which East will be entitled to receive 57%;

• the financial analyses performed by the Company's financial advisor were premised on outdated financial information which lead to an undervaluing of the Company's NAV per share and skews the Adviser's conclusion on which the Board relied;

• the Adviser's fee structure under the proposed Investment Management Agreement, including the incentive fee of 20% of the Company's net capital gains and 20% of the Company's cumulative net return in excess of 8.75%, creates serious conflicts and misaligns the interest of the Adviser and the Company's shareholders, and the incentive fees are substantially dilutive to current shareholders' up-side participation in any of the Company's investment returns;

• there is no credible support that the value of the assets to be contributed by East, which comprise 52.4% of the aggregate consideration to be received by the Company in the proposed transaction, has been accurately measured;

• East is incentivized to over-value the assets to be contributed, and the Company has failed to provide adequate information regarding the nature of these contributed assets or the process by which the Company and East have agreed on their value;

• there is no assurance that the Company will declare the Special Dividend or any other dividends in the future; and

• the $750,000 termination fee payable by the Company if the proposed transaction were not to be consummated, and the $500,000 fee payable to the Company's financial advisor are excessive and potentially debilitating to the Company and its shareholders.

Without the Company or the Board of Directors seeking to address any of User-Friendly's concerns, User-Friendly feels constrained to oppose the transaction, and intends to vote AGAINST the proposed transaction.

27.     On April 22, 2019, User-Friendly announced that it sent a letter to the Company's stockholders notifying them that User-Friendly planned to file its own proxy materials, which would detail User-Friendly's reasons for opposing the Proposed Transaction.  The letter provided:

April 22, 2019

Dear Fellow Stockholders,

I am Bruce Howard, Chief Executive Officer of User-Friendly Phone Book, LLC ("User-Friendly"), the largest individual stockholder of Rand Capital Corporation ("Rand" or the "Company"). User-Friendly is very concerned that Rand's proposed transaction with East Asset Management, LLC ("East") is not in the best interests of the Company or its stockholders. We plan on filing a proxy statement with the Securities and Exchange Commission and will soon provide you with information regarding why User-Friendly believes that the terms of the proposed transaction with East are inadequate and not in the best interests of the Company or its stockholders.

User-Friendly urges you to refrain from voting until you have had an opportunity to review our proxy materials and to understand better our objections to the proposed transaction with East. You deserve the opportunity to review the information regarding why we believe the terms of the proposed transaction are inadequate and to decide for yourself what best serves your interests.

Under the Stock Purchase Agreement with East, Rand has agreed to sell control of the Company for $3.00 per share, or aggregate consideration of $25.0 million in a mix of cash and private investments. For the reasons that will be explained in detail in our proxy materials to be delivered to you shortly, we intend to vote AGAINST the proposed transaction.

By now you have likely received the proxy materials and a proxy card from Rand for the Special Meeting scheduled to be held on May 16, 2019. The Rand proxy statement, among other things, is asking you to approve the proposed transaction with East.

Please do NOT respond to any solicitation made by Rand's management and do NOT return a proxy card voting for the proposed transaction with East.

You will soon be receiving our proxy statement and our WHITE proxy card urging you to vote AGAINST the proposed transaction with East by voting AGAINST each proposal to be voted upon at the Special Meeting.

Our interests are aligned with yours — to maximize the value of our investment in Rand.

• DO NOT return the proxy card sent to you by Rand.
• DO NOT allow Rand's proxy solicitor to call you at home and take your vote over the telephone.

We appreciate your support, and if you have any questions, please call our proxy solicitor MacKenzie Partners toll-free at 800-322-2885 or collect at 212-929-5500.

Sincerely,

Bruce Howard
Chief Executive Officer
User-Friendly Phone Book, LLC

28.     On April 26, 2019, User-Friendly filed a proxy statement with the SEC (the "User-Friendly Proxy"), which sought support from Rand Capital's stockholders to vote against the Proposed Transaction.

29.     According to the User-Friendly Proxy, in August 2018, User-Friendly held a telephonic meeting with Rand Capital and discussed the possibility of contributing an existing portfolio company with a proposal value of $16.0 million to the Company in exchange for additional shares of Company common stock at an unspecified issuance price.

30.     On September 18, 2018, User-Friendly met with representatives of the Company, its financial advisor, and East Asset, and East Asset presented the proposed terms of a draft letter of intent and exclusivity agreement to User-Friendly.  User-Friendly expressed its dissatisfaction regarding the proposed terms.

31.     Nevertheless, the Company and East Asset entered into the Stock Purchase Agreement on January 24, 2019.

32.     As set forth in the User-Friendly Proxy:

User Friendly believes that the Sale Below NAV Proposal severely undervalues the Company's Common Stock and substantially dilutes current Rand shareholders without adequate consideration for relinquishing control of the Company. Accordingly, User Friendly recommends that you vote "AGAINST" Proposal 1 (the Sale Below NAV Proposal). . . .

User Friendly recommends that you vote "AGAINST" Proposal 2 (the Nasdaq Proposal) for the same reasons User Friendly recommends you vote "AGAINST" the Sale Below NAV Proposal. . . .

User Friendly recommends that you vote "AGAINST" Proposal 3 (the Investment Management Agreement Proposal) because User Friendly believes it is premature to externalize management before Rand has established strategic direction. . . .

User Friendly recommends that you vote "AGAINST" Proposal 4 (the Certificate of Incorporation Amendment Proposal) because User Friendly believes without the approval of the Sale Below NAV Proposal, there is no need for additional shares of Common Stock to be authorized. User Friendly believes to do so would allow Rand management to potentially enter into other dilutive transactions without the consent of shareholders. . . .

User Friendly recommends that you vote "AGAINST" Proposal 5 (the Adjournment Proposal) because User Friendly does not believe that Rand management should be permitted to alter the Special Meeting process if shareholders have made it clear that the Proposed Transaction is not in the best interest of the Company by not approving the Proposed Transaction.

User Friendly has no special interest in the defeat of any of the Rand Special Meeting Proposals or the Proposed Transaction generally. User Friendly believes that its interests are aligned with all shareholders of Rand. . . .

33.     On April 26, 2019, User-Friendly also filed a presentation with the SEC further outlining its reasons for opposing the Proposed Transaction.

***The Proxy Statement Omits Material Information***

34.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction, which recommends that Rand Capital's stockholders vote to approve the Proposed Transaction at a special meeting of stockholders scheduled for May 16, 2019.

35.     As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction.

36.     The Proxy Statement omits material information regarding the Proposed Transaction consideration and the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, Keefe, Bruyette & Woods, Inc. ("KBW").

37.     The Proxy Statement fails to adequately disclose the nature of the Contributed Investment Assets as well as how the Contributed Investment Assets were valued by the Company and East Asset.

38.     With respect to KBW's *Selected Public Companies Analysis – BDCs with Market Capitalization less than $300 Million*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by KBW in the analysis.

39.     With respect to KBW's *Selected Public Companies Analysis – Total Return BDCs*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by KBW in the analysis.

40.     With respect to KBW's *Selected Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by KBW in the analysis.

41.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

42.     The Proxy Statement also fails to disclose whether the Company entered into any non-disclosure agreements that contained "don't ask, don't waive" provisions that are or were preventing the counterparties from requesting waivers of standstill provisions to submit superior offers to acquire the Company or Company shares, including the agreements with Party A and Party B.

43.     Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were permitted to do so, when in fact they are or were contractually prohibited from doing so.

44.     The omission of the above-referenced material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background of the Transactions; (ii) Reasons for the Transactions; and (iii) Opinion of the Company's Financial Advisor.

45.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Rand Capital**

46.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

47.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Rand Capital is liable as the issuer of these statements.

48.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

49.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

50.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy

Statement and in other information reasonably available to stockholders.

51.     The Proxy Statement is an essential link in causing plaintiff to approve the Proposed

Transaction.

52.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and

Rule 14a-9 promulgated thereunder.

53.     Because of the false and misleading statements in the Proxy Statement, plaintiff is

threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

54.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of Rand Capital within the

meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers

and/or directors of Rand Capital and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the false statements contained in the Proxy Statement,

they had the power to influence and control and did influence and control, directly or indirectly,

the decision making of the Company, including the content and dissemination of the various

statements that plaintiff contends are false and misleading.

56.     Each of the Individual Defendants was provided with or had unlimited access to

copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause

them to be corrected.

57.     In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Proxy Statement.

58.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

59.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff is threatened with irreparable harm.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  April 29, 2019

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
(302) 295-5310

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
(484) 324-6800

**WEBSTER SZANYI LLP**
*s/ Thomas S. Lane*

By:  _____
      Thomas S. Lane
      1400 Liberty Building
      Buffalo, NY 14202
      (716) 842-2800

      *Attorneys for Plaintiff*